**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| **LOGAN BERKOWITZ,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **vs.** | ) | **Case No. 08 C 4940** |
| | ) | |
| **UNITED AIRLINES EMPLOYEE WELFARE BENEFIT PLAN,** | ) | |
| | ) | |
| | ) | |
| **Defendant.** | ) | |

**MEMORANDUM OPINION AND ORDER**

MATTHEW F. KENNELLY, District Judge:

Plaintiff Logan Berkowitz has sued the United Airlines Employee Welfare Benefit Plan (the Plan) for wrongful denial of benefits under the Employee Retirement Income Security Act of 1974 (ERISA), 29 U.S.C. § 1132 (a)(1)(B). The Plan has moved for summary judgment on Berkowitz's claim. For the following reasons, the Court grants the Plan's motion.

**Facts**

Because the Plan has moved for summary judgment, the Court views the facts in the light most favorable to Berkowitz and draws reasonable inferences in his favor. *See, e.g.*, *Nat'l Athletic Sportswear, Inc. v. Westfield Ins. Co.*, 528 F.3d 508, 512 (7th Cir. 2008).

Berkowitz is a beneficiary of health care benefits under the Plan, which is administered by Blue Cross Blue Shield of Illinois (Blue Cross). To qualify for payment,

the expense must be covered under the Plan. The Plan's Medical PPO Option defines covered expenses as those "expenses actually incurred by or on behalf of an Employee . . . but only to the extent that the expenses are . . . determined by the Plan Administrator . . . to be Medically Necessary . . . and . . . [are] not excluded by . . . the provisions of Section 8 of the Plan." Mot. for Summ. J., Ex. 6. Section 8.1 of the Plan, entitled "Medical Benefit Exclusions," provides that "no payment will be made under the Medical PPO Option provisions of the Plan for expenses incurred . . . for any service . . . that is not Medically Necessary." *Id*.

The Plan defines the term "medically necessary" as follows:

> Medically Necessary means that the services . . . are, in the determination of the Plan Administrator or its delegate: (1) appropriate and required for the diagnosis or treatment of the patient's condition; (2) safe and effective in curing or materially alleviating the patient's Sickness . . . according to accepted clinical evidence reported by generally recognized medical professionals or publications or provided in a clinically controlled research setting using a specific research protocol that meets [specific] standards . . . ; (3) required for reasons other than the convenience of the patient, Licensed Physician, or other Eligible Provider; (4) provided that there is not a less intensive or more appropriate . . . treatment alternative that could have been used in lieu of the . . . service . . . given; and not . . . done primarily for research. *Id*.

Berkowitz suffers from maxillary hypoplasia, an underdeveloped upper jawbone, and mandibular hyperplasia, an overdeveloped lower jawbone, which has resulted in a skeletal malocclusion, namely an inability to close his mouth properly. Berkowitz's oral surgeon, Dr. Michael Steichen, met with Berkowitz and his parents on August 10, 2006 and discussed the possibility of combining orthodontics with orthognathic surgery to correct the malocclusion.

On August 28, 2006, Dr. Steichen sent a letter to Blue Cross requesting pre-approval for the proposed orthognathic surgery. In his letter, Dr. Steichen explained that "[Berkowitz's] chief complaint is the inability to chew because his teeth do not meet together properly, thus preventing proper mastication. . . . The medical necessity for the treatment is that the resultant abnormal growth has rendered the patient incapable of chewing normally." *Id.*, Ex. 8. Dr. Steichen enclosed copies of Berkowitz's panorex, cephalometric x-ray, and photos for Blue Cross' review.

The record also includes an August 18, 2006 letter from Dr. Steichen to Berkowitz's orthodontist, Dr. Michael Hayward.[1] *Id.*, Ex. 10. Dr. Steichen explained in the letter that the "night guard" Dr. Hayward had supplied to Berkowitz helped correct his lack of occlusion (i.e., the lack of contact of the upper and lower teeth when the jaws are closed) because it offered some occlusal contact. In the letter, Dr. Steichen identified Berkowitz's problems, which he said included severe class III malocclusion, maxillary hypoplasia, relative mandibular prognathism, and missing various permanent teeth. Dr. Steichen also included the tentative treatment plan that he discussed with Berkowitz and his parents on August 10, 2006, which included surgery on Berkowitz's upper and lower jawbones, removal of teeth, and placement of dental implants.

After receiving Dr. Steichen's initial request for pre-approval of the proposed orthognathic surgery, Blue Cross sent two letters to Dr. Steichen dated September 6, 2006 and October 10, 2006. *Id.*, Exs. 11 & 12. The letters stated that Blue Cross

---

[1] Though it is unclear when or how Blue Cross obtained this letter, it was provided to the dentists who reviewed the file at Blue Cross' request when Berkowitz appealed the denial of benefits.

needed additional information to complete its review. In the first letter, Blue Cross requested "[p]atient health history and physical form including functional complaints with physician summary and computer generated facial measurements." *Id.*, Ex. 11. In the second letter, Blue Cross requested "[a]nthropometric imaging, historical medical record documentation of functional impairment and interventions including orthodontia if applicable." *Id.*, Ex. 12.

In response, Dr. Steichen did not provide the medical history information that Blue Cross had requested. Rather, in a letter dated October 25, 2006, he essentially repeated his earlier comments, stating that Berkowitz "exhibits severe maxillary hypoplasia which has resulted in a skeletal malocclusion [that] prohibits the proper functions of speech and mastication and as such [his condition] satisfies the criteria for a functional impairment. Orthodontics alone will not correct this skeletal deformity." *Id.*, Ex. 13. Dr. Steichen enclosed Berkowitz's "most recent cephalometric x-ray along with the tracing" for re-review by Blue Cross. *Id.* On November 17, 2006, Blue Cross determined that Berkowitz was not eligible for surgery under the Plan "because medical records do not document progressive functional impairment or masticatory abnormality that interferes with nutrition." *Id.,* Ex. 14.

In letters dated January 15, 2007 and January 17, 2007, Drs. Hayward and Steichen responded to Blue Cross' denial of benefits and requested further review. Dr. Hayward stated that "[d]ue to many missing permanent teeth and severe malocclusion it is critical that [Berkowitz] undergo orthognathic surgery" and that, in his opinion, "if [Berkowitz's] malocclusion is not corrected with surgery it will very [sic] difficult to

maintain his detention for his lifetime." *Id.*, Ex. 15. Dr. Steichen stated in his letter that Berkowitz's condition was "not corrected by orthodontics alone" and that "[Berkowitz's] chief complaint is his inability to chew food normally and properly." *Id.*, Ex. 16. Dr. Steichen enclosed another cephalometric x-ray and photos of Berkowitz.

Dr. Hayward included two pages of records with his letter. The first page consisted of five office visit note entries, the first dated August 8, 2006 and the last dated September 18, 2006. The second page was a medical intake form showing that Berkowitz visited the doctor on August 1, 2003 because of a "jaw problem" and that he suffers from mild asthma. *Id.,* Ex. 22. The notes did not provide the Plan with new information about Berkowitz's condition. The most substantive notes that Dr. Hayward provided were dated August 10, 2006 and, though partially illegible, simply identified Berkowitz's condition: severe class III malocclusion, maxillary hypoplasia, relative mandibular prognathism, and missing various permanent teeth. *Id.*

Blue Cross referred Berkowitz's file to Dr. Henry Stempien, a board-certified dentist with a subspecialty certificate in oral and maxillofacial surgery. Dr. Stempien works for MES Solutions, a contract evaluation service. In a report for Blue Cross dated March 8, 2007, Dr. Stempien said that Dr. Steichen proposed the surgery for functional indications and that Berkowitz has a functional disturbance because he has difficulty chewing. Dr. Stempien determined, however, that the surgery was not medically necessary because Berkowitz's condition is "within normal limits" and "[t]here is no history of eating disorders, speech impediments, or continued temporomandibular joint problem." *Id.*, Ex. 18. Dr. Stempien concluded his report by confirming that the purpose of the surgery was not for temporomandibular joint syndrome (TMJ) or

cosmetic indications. *Id.*

On March 9, 2007, Blue Cross responded to Dr. Steichen's appeal and reaffirmed its decision to deny benefits to Berkowitz for orthognathic surgery. *Id.*, Ex. 17. Blue Cross' letter essentially restated Dr. Stempien's summary of the records and the reasons he provided for why the surgery was not medically necessary. *Id.*

In a letter dated May 15, 2007, Dr. Steichen responded to Blue Cross by enclosing a letter from Berkowitz's physician, Dr. W. Pierce, which Dr. Steichen claimed "documents the masticatory and gastrointestinal problems caused by [Berkowitz's] skeletal malocclusion." *Id.*, Ex. 24. In that letter, dated March 21, 2007, Dr. Pierce stated that Berkowitz's "condition affects his ability to chew food properly and may cause difficulty with swallowing/choking, indigestion, gastrointestinal discomfort and poor nutritional absorption. Due to [Berkowitz's] growth deformity and possible effects to his health, it is recommended that surgical correction be performed by an oral surgeon." *Id.*, Ex. 25. On June 4, 2007, Blue Cross advised Dr. Steichen that "no new information was sent in to review for an appeal." *Id.*, Ex. 26.

Blue Cross referred Dr. Steichen's appeal to Dr. Daniel Gesek, another dentist with MES Solutions, who specializes in oral and maxillofacial surgery. Blue Cross asked Dr. Gesek to determine only whether the proposed orthognathic surgery was medically necessary according to the Plan's language. In his report, which is undated, Dr. Gesek stated that Berkowitz has difficulty chewing his food and that "there may be episodes of indigestion, choking, and absorption concerns." *Id.*, Ex. 28. Nonetheless, Dr. Gesek concluded, "the proposed orthognathic surgery is not medically necessary

according to the Benefit Language" because, he stated, there was insufficient "documentation to substantiate a functional deficit." *Id.*

On October 26, 2007, Blue Cross responded to Dr. Steichen's second appeal of the denial of benefits. Blue Cross reaffirmed its decision to deny the claim. Its letter amounted to a restatement of Dr. Gesek's summary of the record and the reasons he gave in his report for why the surgery was not medically necessary. *Id.*, Ex. 27.

Dr. Steichen responded in a letter addressed to Dr. Gesek dated November 25, 2008. *Id.*, Ex. 30. Dr. Steichen stated that he did not understand how Dr. Gesek could agree that Berkowitz may have "episodes of indigestion, choking and absorption concerns" but conclude that "there is not enough information presented to assert medical necessity." *Id.*, Ex. 30. Dr. Steichen contended that "[b]y all medical standards, [Berkowitz's condition] constitute[d] a functional deficit." *Id.*

In a letter dated December 4, 2008, Berkowitz's counsel requested another appeal of the denial of benefits and sent Dr. Steichen's November 25, 2008 letter directly to Blue Cross for its consideration. *Id.*, Ex. 29. In response, Blue Cross wrote a letter dated January 7, 2009, reaffirming its decision to deny reimbursement for the surgery. In the letter, Blue Cross stated that its appeals medical director had reviewed Berkowitz's file and found that the documentation submitted for appeal was "not sufficient to establish medical necessity." *Id.,* Ex. 31. In a section entitled "Additional Action," Blue Cross informed Berkowitz that he "may submit more information that may support the medical necessity of orthognathic surgery. *Examples of such include clinical information* that the patient is having problems as a result of his abnormal bite,

and that these problems cannot be addressed by conservative, non-surgical means." *Id.* (emphasis added).

**Discussion**

Summary judgment is appropriate if "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56©. To determine whether a genuine issue of material fact exists, the Court must view the record in the light most favorable to the nonmoving party and draw reasonable inferences in that party's favor. *Anderson v. Liberty Lobby*, 477 U.S. 242, 248 (1986); *Lesch v. Crown Cork & Seal Co.*, 282 F.3d 467, 471 (7th Cir. 2002). A genuine issue of triable fact exists only if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.* at 248.

**A. Standard of review**

The Court reviews a plan administrator's denial of ERISA benefits under a *de novo* standard unless the language of the plan clearly gives its beneficiaries notice that "the administrator . . . [has] discretionary authority to determine eligibility for benefits or to construe the terms of the plan." *Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101, 115 (1989). "If . . . discretion is clear from the language of the plan, [a court] will set aside an administrator's decision only if it is arbitrary and capricious." *Black v. Long Term Disability Ins.*, 582 F.3d 738, 743-44 (7th Cir. 2009). The parties agree that the arbitrary and capricious standard of review applies to the Plan's denial of benefits.

"Although [the arbitrary and capricious] standard is deferential, it is not a 'rubber

stamp' and [the Court] will not uphold a denial if the administrator fails to provide specific reasons for rejecting evidence and denying the claim. In reviewing those reasons and the denial as a whole, however, [the Court] looks only to ensure that the decision has rational support in the record." *Id.* at 745 (citations omitted); *see also* *Speciale v. Blue Cross and Blue Shield Ass'n*, 538 F.3d 615, 621 (7th Cir. 2008); *Exbom v. Central States, Se. and Sw. Areas Health and Welfare Fund*, 900 F.2d 1138, 1143 (7th Cir. 1990) ("If the trustee makes an informed judgment that articulates an explanation for it that is satisfactory in light of the relevant facts, *i.e.*, one that makes a 'rational connection' between the issue to be decided, the evidence in the case, the text under consideration, and the conclusion reached, then the trustee's decision is final.").

**B. The Plan's review of Berkowitz's claim**

When an administrator denies benefits, ERISA and its governing regulations "require 'full and fair' assessment of claims and clear communication to the claimant of the 'specific reasons' for benefit denials." *Black & Decker Disability Plan v. Nord*, 538 U.S. 822, 825 (2003); *see also Hackett v. Xerox*, 315 F.3d 771, 775 (7th Cir. 2003). An administrator's communication withstands scrutiny if it substantially complies with the regulations. *Brehmer v. Inland Steel Inds. Pension Plan*, 114 F.3d 656, 662 (7th Cir. 1997). The "question [the Court must answer is] whether the beneficiary was provided with a statement of reasons that allows a clear and precise understanding of the grounds for the administrator's position sufficient to permit effective review." *Hackett*, 315 F.3d at 775.

Berkowitz contends that the Plan deprived him of full and fair review because

Blue Cross blindly relied on Dr. Stempien and Dr. Gesek's reports without stating in its letters what it would take to approve his request for benefits or its reason for denying coverage. The Plan contends that Blue Cross clearly articulated the basis of its denial and properly informed Berkowitz what documents were needed to sustain his claim. The Plan further asserts that even if the denial letters did not strictly adhere to ERISA's governing regulations, its correspondence substantially complied.

**1. The Plan's explanation of the denial of benefits**

In a letter dated November 17, 2006, Blue Cross denied Berkowitz's initial request because it found that the "medical records do not document progressive functional impairment or masticatory abnormality that interferes with nutrition." *Id.,* Ex. 14. Blue Cross reaffirmed its denial of benefits in its letters dated March 9, 2007 and October 26, 2007. Berkowitz criticizes Blue Cross for essentially copying the language of the reports prepared by the two dentists, Dr. Stempien and Dr. Gesek, that it retained via MES Solutions. "[A]n administrator's decision to seek independent expert advice [, however,] is evidence of a thorough investigation." *Davis v. Unum Life Ins. Co. of Am.*, 444 F.3d 569, 575 (7th Cir. 2006); *see also Hightshue v. AIG Life Ins. Co.*, 135 F.3d 1144, 1148 (7th Cir. 1998). Furthermore, plan administrators can rely on the opinions of "doctors who reviewed the file and gave doctor-like explanations for their conclusions." *Davis*, 444 F.3d at 579.

Both Dr. Stempien and Dr. Gesek concluded that the surgery was not medically necessary. The Seventh Circuit has found a plan's denial of benefits arbitrary and capricious when it based the decision on the opinion of a physician who did not

examine the claimant's complete medical history. *See Leger v. Tribune Co. Long Term Disability Benefit Plan*, 557 F.3d 823 (7th Cir. 2009); *Hawkins v. First Union Corp. Long-Term Disability Plan*, 326 F.3d 914 (7th Cir. 2003) (finding error where physician dismissed complaints of pain because they are subjective). In his report, however, Dr. Stempien explained that he had reviewed the complete record, and he acknowledged that Berkowitz suffers from abnormal occlusion. Nonetheless, he found that the record lacked evidence of medical necessity, because it did not reflect a "history of eating disorders, speech impediments, or continued temporomandibular joint problem."[2] Mot. for Summ. J., Ex. 18.

Dr. Gesek's report also reflects that he considered all of Berkowitz's evidence. He acknowledged that while "there may be episodes of indigestion, choking, and absorption concerns," the records did not include sufficient information to show medical necessity for the proposed surgery. *Id.*, Ex. 28. Although Dr. Gesek's report did not provide a detailed explanation of what further documentation was required to demonstrate medical necessity, other correspondence provided by the Plan, in its entirety, sufficiently explained what was required. *See Halpin v. W.W. Grainger, Inc.*, 962 F.2d 685, 693 (7th Cir. 1992) ("[S]ubsequent letters sent by an administrator can remedy deficiencies in a denial letter and amount to substantial compliance with the regulation.").

---

[2] Berkowitz attacks Dr. Stempien's report because the Plan allegedly did not provide him with the policy definition for "medically necessary." Even if this is true, it is clear from Dr. Stempien's report and Blue Cross' prior correspondence that both agreed that orthognathic surgery is "medically necessary" when the patient's documented medical history demonstrates objectively that the condition interferes with nutrition.

The Plan was not required to describe in detail the entirety of the "interpretative process that generated the reason for the denial." *Mote v. Aetna Life Ins. Co.*, 502 F.3d 601, 606 (7th Cir. 2007). The record shows that Blue Cross' correspondence, considered as a whole, provided Berkowitz with a statement of reasons that explained the basis for its position. *See Nord*, 538 U.S. at 825; *Hackett*, 315 F.3d at 775. In its first two letters, Blue Cross requested copies of Berkowitz's "health history and physical form including functional complaints with physician summary" and his "historical medical record [with] documentation of functional impairment." Mot. for Summ. J., Exs. 11 & 12. Blue Cross' first denial letter specifically stated that it wanted to ascertain whether there was "progressive functional impairment or masticatory abnormality that interferes with nutrition." *Id.*, Ex. 14. Blue Cross' subsequent letters stated that although Berkowitz was experiencing difficulty chewing food and might, in the future, suffer from poor nutritional absorption, that did not demonstrate medical necessity for the surgery. *See id.*, Exs. 17, 27. Taken together, Blue Cross' letters communicated to Berkowitz that the Plan required objective documentation of actual and current interference with his nutrition or speech, not simply subjective complaints, undocumented contentions, or the possibility of a future impairment, and documentation that any such problem could not be dealt with short of surgery.

It was not unreasonable for the Plan to determine that orthognathic surgery is medically necessary only if there is objective documentation of actual and current interference with nutrition or speech.[3] *See Hightshue,* 135 F.3d at 1149 (finding that

---

[3] The Plan's reliance on *Werbler v. Horizon Blue Cross Blue Shield of N.J.,* No. (continued...)

the Court "accept[s] any reasonable interpretation which [the Plan] gives a plan term."); *see also Sisto v. Ameritech Sickness & Accident Disability Benefit Plan*, 429 F.3d 698, 701 (7th Cir. 2005) (administrators have discretion to interpret contract terms narrowly because "questions of judgment are left to the plan administrator.") (internal quotation marks and citation omitted). Similarly, it was not unreasonable for the Plan to require objective documentation of such an actual and current impairment. *See Williams v. Aetna Life Ins. Co.*, 509 F.3d 317, 323-24 (7th Cir. 2007) (finding that plan's "denial of benefits . . . on the basis of [the physician's] failure to provide accurate information detailing how [claimant's] fatigue limited his functional abilities was not arbitrary and capricious.").

Although Berkowitz's physicians submitted a good deal of information to Blue Cross, they did not provide the information that Blue Cross said it needed to determine medical necessity for the surgery. For instance, although all three of Berkowitz's treating physicians opined that Berkowitz's condition amounted to a functional deficit that required surgery, they provided no objective documentation of testing or other evidence showing a current functional impairment or of how, if at all, the condition had progressed over time. (Nor does Berkowitz suggest that such documentation cannot be provided because, for example, no objective form of testing exists.) The two pages of records that Dr. Hayward submitted on January 15, 2007 only covered a period of less

---

[3](...continued)
05-3528, 2006 WL 3511181 (D.N.J. Dec. 5, 2006), to support its decision that the surgery was not medically necessary is misplaced. In *Werbler*, the claimant sought orthognathic surgery for aesthetic reasons, and the plan specifically excluded orthognathic surgery for that purpose. In this case, there appears to be no question that the surgery is proposed for functional reasons.

than two months and included no new information for the Plan to consider. If the claimant does not provide information that the administrator seeks, then the administrator "d[oes] not act arbitrarily or capriciously in denying benefits [based] on the data it had before it." *Bali v. Blue Cross & Blue Shield Ass'n*, 873 F.2d 1043, 1048 (7th Cir. 1989), *overruled on other grounds*, *Diaz v. Prudential Ins. Co. of Amer.*, 424 F.3d 635 (7th Cir. 2005).

### 2. The Plan's consideration of the treating physician's contrary medical opinion

Berkowitz claims that the Plan's failure to acknowledge concerns about Dr. Gesek's report that Dr. Steichen expressed in his November 25, 2008 letter supports the contention that the denial of coverage was arbitrary and capricious. Throughout the process, Dr. Steichen disagreed with the Plan's decision and maintained that Berkowitz's condition "constitutes a severe functional deficit." Mot. for Summ. J., Ex. 30. Plan administrators are not, however, required to accord a treating physician's opinion special weight. *See Nord*, 538 U.S. at 834. Rather, the administrators are only required to "provide specific reasons for rejecting evidence." *Black,* 582 F.3d at 745. As explained above, the Plan sufficiently informed Berkowitz of the type of evidence required to prove medical necessity, and this made it sufficiently clear why the evidence his physicians offered was considered insufficient.

## Conclusion

For the foregoing reasons, the Court concludes that the denial of benefits was neither arbitrary nor capricious and therefore grants defendant's motion for summary judgment [docket no. 36]. The Clerk is directed to enter judgment in favor of the

defendant.

MATTHEW F. KENNELLY
United States District Judge

Date: November 10, 2009